Carrel v. Aids Healthcare Foundation, Inc. Good morning, Your Honors. May it please the Court, my name is Jeffrey Kaiser, and together with Diana Martin, seated here at the Council Table, we represent the Relators Appellant on this appeal, as we did below. Paying for patient referrals is illegal. It's unlawful under the anti-kickback statute. Paying for patient referral services is not. The District Court conflated those two concepts, and in our view, committed reversible error in granting summary judgment below. Now we also, I'm looking at the plain text of these acts and having a hard time with your argument. The anti-kickback statute allows any amount paid by an employer to a bona fide employee for employment in the provision of covered items or services, right? That's correct. The Ryan White Act permits funding of core medical services, right? That's correct. A phrase that includes early intervention services. True. Which include referrals of individuals with HIV-AIDS to appropriate providers of health and support services, including to entities receiving funding under the Ryan White Act for the provision of such services, right? That's correct, Your Honor. If I may then respond and perhaps clarify for the Court, the Ryan White statute, by referring patients into care as a service, as a core medical service, as an early intervention service. The anti-kickback statute recognizes the existence and need in appropriate circumstances to provide referral services, and specifically and explicitly recognizes the distinction between providing those services and paying the cost of those services and buying the referral itself and paying for the referral itself. Specifically. By an employee? There's no dispute Rodriguez is an employee, right? There's no dispute, Your Honor, and I'll get to that because that's a fair point and it's the interplay between the referral services that are authorized under both statutes, under the anti-kickback statute and the Ryan White statute, and the employee safe harbor. The employee safe harbor protects payments made to bona fide employees if, and only if, they are made to that employee for the provision or furnishing of a reimbursable item or service. What happened in the District Court below, in our view, is that the District Court first misinterpreted the Ryan White statute to authorize the payment for the referral itself, as opposed to the performance of a referral service, and then that error, in our view, paved the way for the second error, which was to interpret the employee safe harbor to protect that payment on the ground that what they paid for was a reimbursable item or service under the Ryan White statute. What we are saying, what we've argued in our brief, is that there is a chasm between paying for a referral and actually paying for the service of referring patients into care. That is a huge difference under the anti-kickback statute. That's the reason why, under the referral services safe harbor, if you pay for the referral, you're not protected by the safe harbor. You're only protected by that safe harbor if you comply, in addition to the disclosure requirements of that safe harbor, if you comply with the requirement that you're paying only for the cost of the service and not for the referral itself. Were it otherwise, the anti-kickback statute would be entirely eviscerated. Our argument, with respect to the grant of summary judgment below, and as you know, we've also argued that the District Court committed error in its application of Rule 9B. I don't want to be remiss in not mentioning that, because the reason why we're having this discussion, with respect to that very narrow issue on the summary judgment below, is because all of the other claims and kickback allegations and healthcare programs, Medicare and Medicaid, were essentially taken out of the case through what we believe was an unduly restrictive application of Rule 9B, in a manner that we believe was inconsistent with this circuit's precedent and inconsistent with the detailed allegations of the Third Amendment complaint. I wanted to say that because I did want to focus on this first, given the press of time. With respect to Your Honor's point, that is our essential position, that the Court misinterpreted Ryan White to permit payments for referrals, in other words, capturing program business for the organization's own benefit as a reimbursable item or service, when in fact, the language defines it as a service. And if Ryan White, the statute is defining it as a service, there's no basis in law or common sense, in our view, for interpreting that in a way that would contradict the anti-kickback statute's requirements and the safe harbor's requirements under the anti-kickback statute. If you pay for a referral, and that individual is then provided services that are paid for by a federal healthcare program, and there's no dispute on this appeal that Ryan White is a federal healthcare program, then you violated the anti-kickback statute. And interestingly, and as the Court is aware, the government below adopted that same interpretation of Ryan White. And we believe it was erroneous, and we believe the District Court essentially adopted that erroneous interpretation. But as you also know, the government general position is that you can pay for referrals and have that protected by the employee safe harbor, even when the employee is bona fide. Because there are two parts to the safe harbor. First, bona fide, and second, the money has to be paid to the employee for the provision or furnishing of a reimbursable item or service. Office of Inspector General repeatedly has interpreted the employee safe harbor to require both. And we've cited several of those advisory opinions in our brief. Those opinions are issued pursuant to statute. But the government says they're right. Excuse me? Of course, the government says they're right. And I'm drawing the sting, as it were, because I know that's going to come up, that they filed a statement of interest below. And that's why I wanted to make the point that I just did, which is that the government's general position with respect to federal healthcare programs other than Ryan White, to go to the point you were making before about the employee safe harbor, is that that safe harbor does not protect payments that are made even to bona fide employees that are solely for the referral, that are not tied to the services of the employee. You can have incentive compensation, no problem. You can have a bona fide employee physician at a hospital or a group practice and pay them out of a bonus pool. They can be paid a percentage of collections, not a problem, protected under the employee safe harbor, because it's tied to their services. What you cannot do, what the government has stated in the Medicare-Medicaid context numerous times, is that you can't pay for the referral. You can't capture the business. You can't game the system. That you're not allowed to do. The reason they took a different position below was only because they interpreted the Ryan White statute as allowing that uniquely among federal healthcare programs, paying for the referral. What we're trying to say is that when you read the statute, it doesn't say that. It says it's a service. Any kickback statute contemplated the provision of referral services, imposed very specific requirements for the provision of referral services to ensure that you weren't paying for the referral, that you weren't undermining patient freedom of choice, that you weren't encouraging anti-competitive behavior in the marketplace. They did not do that here. He was employed in the provision of services, wasn't he? He was receiving salary. His referral was a predicate to later service, right? He was employed in the provision of a reimbursable service under Ryan White by virtue of the salary he was getting for connecting patients to care. That is correct. But what we are saying is that the bonus checks, the bonus program that was paid separately from the salary, that was issued entirely separately and only for self-referrals to AHF, that is what violated the anti-kickback statute. We're not challenging the legitimacy of the salary. That is not what we're saying violated the anti-kickback statute in the False Claims Act. We are arguing that what violated the law was the separate bonus program that was specifically implemented to generate self-referrals to the organization. Because no organization, no matter whether it's for-profit or not-for-profit, whether they're involved in otherwise meritorious medical services or not, nobody is allowed to game the system by purchasing referrals for itself at the expense of others and at the expense of patient freedom of choice. And weren't the bonuses paid regardless of the funding source, whether the funding source was the Ryan White program or Medicaid-Medicare? That is correct, Your Honor. And that's why we're sort of in some ways in this artificially narrow world when I'm talking about this because of the Rule 9b application on the motion to dismiss, which we think was wrong as well. But that is correct. So this bonus program operated agnostically with respect to the payer source, whether it was Medicare, Medicaid, Ryan White. If they connected a patient two times to an AHF facility, that's when the bonus was paid out. If the patient went elsewhere, they did not get the bonus. Now interestingly, every witness on both sides testified to that, except for one AHF witness, James Velaquette, who started the program, the bonus program in Florida. And it had started earlier in California, but he had started it in Florida. And he testified that at its inception and in its conception, the bonus program was intended to pay the bonus to the linkage coordinator no matter where the patient went, which is very interesting because everybody else testified that's not, in fact, how it worked. And that's not, in fact, how the bonus was structured. All of the other AHF witnesses, Mina Gore, the linkage coordinator, Julio Rodriguez, Jason Handy, as well as the relators, they corroborated one another in saying, no, it was not paid. I understand your self-dealing argument, but where does that come from in the statute? Does the statute say you can't just refer to yourself? I mean, where's... Well, the Ryan... Are you talking about the Ryan White statute, Your Honor? Any statute. Okay. So we are not making the argument that AHF could not have appropriately for clinical reasons, for example, referred a patient that was tested and tested positive for HIV to its own service centers. We've not made that argument. And because the Ryan White program does contemplate under one roof comprehensive service provision. And the argument had been made that, well, but if you interpret it the way the relators are interpreting it, that would not be possible. That's not so. You can refer to yourself in an appropriate case for clinical reasons, perhaps it's closer to where... Your criticism is that they only refer to themselves, right? Well, my criticism is that they're paying bonuses to ensure that they only come to themselves. But we're not saying that if you're not paying for the referral, you couldn't for a non-remunerative purpose, for a clinical purpose, for an appropriate purpose, refer to your own service center. And I would preserve the goal of the Ryan White program for allowing the possibility of under one roof comprehensive service provision. What we're saying is you can't buy them. You can't buy them. You can't buy the referrals. You can't game the system by buying the referrals to ensure that you're capturing an exclusive stream of program business for yourself. That's the essence of what the anti-kickback statute stands against. And there is nothing in the wording of the Ryan White statute that would allow that public policy imperative to be overridden. That's really what we're saying. And we believe it obviously applies to more than the John Doe claims in the complaint, that it applies to all of the Ryan White, Medicare, Medicaid claims that would be covered by that organization-wide practice. Okay. Mr. Geiser, you've saved two minutes for rebuttal. Thank you. Good morning, Your Honors, and may it please the Court. Erin Murphy on behalf of Appellee AIDS Healthcare Foundation. This case begins and ends with one simple fact. There is no dispute that the linkage-to-care services that AHF provides are covered services under the Ryan White Act. Indeed, they're not only covered services, but a core component of the Ryan White Act's public health mission. So as the United States explained below, that brings this case squarely within the employee safe harbor to the anti-kickback statute because Congress expressly excluded from the statute's two employees, employed bona fide employees employed in the provision of services that are covered by a federal health care program. Here we don't have a dispute over whether the linkage-to-care specialists are bona fide employees, and we don't have a dispute over whether the services that they're providing are covered by a federal health care program. These claims thus fail as a matter of law because they simply don't state a violation of the statutes that have been invoked here. If I could talk a little bit, I think it's important to put this case in the context of the Ryan White Act because that's really what this case is about. It's quite different from any of the other cases courts have been confronted dealing with referral payments in the employer context. We've got a statute here that is unique among, I think, federal health care programs and that it's designed to deal with a particular disease and specializes in providing funding and services for that disease because of the public health risk that it presents. That's why linkage-to-care and referral services are and always have been explicitly covered by this federal statute because that is a core component of what the federal government's trying to achieve here, ensuring that individuals who test positive for HIV not only get the care that they need, but get the care that will help ensure that this disease doesn't spread. Can you just respond to the argument they make, okay, a point well taken under the Ryan White Act, but you were also paying these bonuses when the funding was not under the Ryan White Act. Sure. That makes absolutely no difference. The Ryan White Act covers the provision of linkage-to-care services regardless of whether the ultimate care that the individual is going to receive is covered by Medicare or Medicaid or whatever federal program it may be because the linkage-to-care service is covered by Ryan White. And so even if ultimately they may get services from AHF or somebody else that's covered by a different federal program, all that matters is whether the payments that are being made to the employees are payments for a service that's covered by a federal health care program. And here it's covered by Ryan White regardless of what the kind of insurer is that is going to pay for whatever other types of care a patient may receive. And of course he says you're not paying for the service, you're paying for the referral. I don't see how that's a meaningful distinction under the Ryan White Act. I mean, the service that's covered under the Ryan White Act is referring people to the care that they need. And I do want to be clear that what we're talking about under Ryan White is something much more than simply handing people a sheet of paper that says here's some places you could go get care. I mean, what's being provided here is a service of helping individuals understand, helping them know the type of care they need, tell them where to get it, work with them to overcome financial barriers, emotional barriers, practical barriers. Linkage-to-care specialists will help them set up the appointments, sometimes they'll go to the appointments with them. So what's going on here is much more than simply, you know, we referred somebody somewhere and that's the end of it. But that said, I mean, the Ryan White Act specifically uses the term referrals as what it is covering as early intervention services. So I don't know how you can really, you know, divorce the referral that it does cover from some sort of other referral that it supposedly doesn't cover. It covers referrals. And that just makes this case, in our view, a very easy case, a very narrow case. It is completely controlled by this particular statute that's here. You know, obviously there's broader issues about, that courts have confronted about when referral payments are and aren't covered under other statutes. I think you . . . Like doctors who are paying other kinds of vendors, healthcare vendors or pharmacies or unrelated kind of entities and their kickbacks associated with that, that's a different kind of problem than paying an employee to do his job. That's absolutely right. And, you know, and I think that, you know, the United States was correct when it said below that you just, you don't need to get into any of the issues that you might confront in different contexts about who can be paid referrals, what types of referral payments count because this is just the easiest employer safe harbor provision case you're ever going to encounter because the actual service that the federal healthcare program covers is the service of referring the individuals who test positive for HIV to the care that they need. Now, I take them . . . Excuse me. And your contention is a referral is a referral. It doesn't have to be neutral because I think that, as I hear the appellants in this case, the issue is, well, if they were neutral referrals, we wouldn't be arguing that there's a violation. But your contention, I guess, is the terms of the act simply do not make that distinction. Absolutely. And it's not only our contention. It was the United States' position as well. They specifically opined on this issue below and agreed with us that there's nothing in the Ryan White Act that prevents so-called self-referrals. To the contrary, as I think I heard the relators concede here today, you know, everyone agrees that Congress explicitly contemplated the idea that it would be a good thing if all of these forms of care and treatment and testing and all the services that someone who tests positive for HIV need are provided under one roof because that in and of itself furthers this critical federal mission of getting people to the care. What the United States called below one stop shopping. Exactly. Exactly. And, you know, if you look at some of the legislative history about early intervention services in particular and about the ways Congress has tried to ensure to keep, you know, evolving the Ryan White Act and the funding it provides to ensure that it's achieving its objectives, you know, they noted that some of the barriers people have encountered is the difficulty of getting the services set up and that it makes it easier for them. If the same person can do the testing, then help them with the linkage and connect them to the care and all of that is available under one roof. So you know, what relators are suggesting here is a theory that would really tremendously disrupt this federal regime that Congress created in the unique context of the Ryan White Act. And we do think the case, you know, can be resolved on that. I think that alone also, you know, deals with any concerns about whether they would have liked to broaden this to include other patients because it just wouldn't have made a difference even if they had some John Doe's who were eligible for Medicare or Medicaid. You would have get to the same result because no matter what, you're always going to come back to the basic problem with their case which is that these referrals, this linkage to care service is a service that's explicitly covered by a federal statute, explicitly covered by a federal health care program. Just to be clear, I mean, if Medicare prohibits a payment, you can't skirt that prohibition by way of the Ryan White Act. The Ryan White Act can't save a misappropriation of funds under the other statute. I mean, yes, but let me, you know, just to be clear about what would really be happening is, you know, there's nothing, first of all, that I'm aware of in any statute that says you can't have this covered. To the extent Medicare and Medicaid don't cover it, that actually just reinforces the conclusion that the Ryan White Act does because part of the eligibility for whether Ryan White Act funding covers something is whether it's not covered by another federal health care program. So if you can't, if linkage to care is not something for which you could receive federal funding under Medicare or Medicaid, that just means, okay, you can always get it under Ryan White Act as long as you have, you know, a patient eligibility, other aspects of it satisfied. So that's why in this context, it makes no difference because there's still going to be, the linkage to care service itself is still going to be covered by the Ryan White Act. And the other thing I just want to make sure that we're clear about here is, I mean, the allegations here about whatever claims were false have nothing to do with the submission, with receiving federal funding for the linkage to care services or the bonuses. The only claims that they've ever said they think are false are the ultimate submission of claims for later provisions of care by AHFs, by, you know, health care facilities and all of that. They've never challenged the reimbursement or federal funding or any money that was received by state entities or federal entities for purposes of providing the actual linkage to care services or the bonuses, which, you know, were fully disclosed to the state and have been paid for in many instances through state funding that is funding the state got through the Ryan White Act. So I think all of that just reinforces the conclusion that, you know, in this particular context, we're not dealing with uncovering some nefarious scheme. This is just the ordinary and intended operation of the Ryan White Act, which does not in any respect run afoul of either the anti-kickback statute or the False Claims Act. There was a contract with the state of Florida, too? That's right. That's right. There's, there's a, there's, sorry, go ahead. How does that inform our analysis? Yeah, you know, there's several different, there's a few different contracts going on here, but there's, there's contracts where basically the state or the county will get money from the federal government and then AHF becomes essentially a subgrantee through, through them. And I think here, you know, what, what strikes me as a particularly notable fact is, I mean, there's no dispute that the, the payment of these bonuses was disclosed in these contracts. There's also no dispute that the contracts actually obligate AHF to provide these linkage to care services. I mean, that is, that is part of what we have to do to keep receiving the funding here. So it would be quite extraordinary to then say that there's some sort of federal law problem with us living up to the terms of the contracts through which we're receiving the federal funding. If there's no further questions, we would ask the Court to affirm. Thank you, Ms. Murphy. Mr. Kizer, you've saved two minutes for rebuttal. Thank you. Well, first, the notion that there's no meaningful distinction between paying for the service and paying for the referral is, is difficult to reconcile. To put it mildly, I'm having a hard time understanding what it is. Well, let me try and, and help with that. The anti-kickback statute is all about outlawing and making a felony, in fact, paying for referrals, ensuring that a referral comes to one provider over another provider. Congress determined that that was important to outlaw. You could pay for the provision of services, right? Safe Harbor allows you to do that, Your Honor. The Safe Harbor also states... And the service includes referrals. No, Your Honor. No, Your Honor. The referral services Safe Harbor, this is not a stretch, I'm not, I'm not really going, pushing the envelope here in interpretation. The referral services Safe Harbor explicitly requires, as a condition of receiving protection against prosecution under the anti-kickback statute, that you are not paying for the referral itself. It recognizes that there is an important public policy and benefit to referring patients into care. But it cannot be done under circumstances that in events and intention to corrupt patient choice or medical decision making and all of the other public policy imperatives underlying the anti-kickback statute, which is why it requires that you not pay for the referral. I also, because I only have 30 seconds left, wanted to make the point that it makes a world of difference whether you're talking about Medicare, Medicaid, or Ryan White. The fact that Ryan White pays for a referral service and you're receiving a salary for that service does not mean that you can pay $100 cash to an employee to refer a Medicare patient, which doesn't pay for referrals or referral services, and then submit services reimbursable by Medicare and not violate the anti-kickback statute. They're very different. Thank you. The court is adjourned for the week.